IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

JUSTIN ANDERSON                                             PETITIONER

v.                              No. 5:12-cv-279-DPM

WENDY KELLEY, Director,
Arkansas Department of Correction                RESPONDENT

## ORDER

1.      Seventeen Octobers ago, Justin Anderson shot and killed Clara

Creech.  There was a randomness about it.  Creech, who was in her eighties,

was bent down, working in her front yard in the small town of Lewisville.

Anderson didn't know her;  he came upon her as he walked down the street.

Anderson was nineteen.  He had lost his job;  he was living with his brother

and his brother's girlfriend.  In the ten days before, Anderson had burgled a

house and stolen two guns, and shot a truck driver who happened to be

asleep in the cab of his tractor when Anderson tried to rob it.  Anderson was

probably trying to steal Creech's car to heal a rift with his brother.  Anderson

confessed.  From the beginning, he hasn't denied shooting Creech.  He has

maintained, instead, that he did so without premeditation or deliberation, and

thus didn't commit capital murder.  A Lafayette County jury rejected this

defense, convicted Anderson, and chose the death penalty.

The case then began its journey — up, down, and around the state and federal courts. The Arkansas Supreme Court affirmed the conviction but reversed the sentence because of obvious confusion about mitigation reflected in the first jury's sentencing verdict forms. *Anderson v. State (Anderson I)*, 357 Ark. 180, 163 S.W.3d 333 (2004). To address pretrial publicity, venue was changed to Miller County, which adjoins Lafayette County in south Arkansas. At the end of an eight-day trial, the second jury came to several conclusions: there were many mitigating circumstances;   there was one aggravating circumstance (Anderson's attempted-murder conviction for shooting the truck driver); and the aggravator outweighed all the mitigators. The second jury therefore also chose the death penalty.  (For legal reasons that will become clearer, one hub of the case now is the performance of Anderson's lawyers as they prepared for and handled this resentencing trial.)

The Arkansas Supreme Court affirmed. *Anderson v. State (Anderson II)*, 367 Ark. 536, 242 S.W.3d 229 (2006). The United States Supreme Court denied review. *Anderson v. Arkansas*, 551 U.S. 1133 (2007). Anderson then returned to the Miller County Circuit Court, seeking post-conviction relief. None was granted. The Arkansas Supreme Court later affirmed that none was required.

*Anderson v. State (Anderson III)*, 2011 Ark. 488, 385 S.W.3d 783. Anderson's timely petition for a writ of *habeas corpus* brought the case here.

2.      The governing legal framework is settled but complicated. The Court recently summarized that law in *Kemp v. Hobbs*, No. 5:03-cv-55-DPM, № 68 at 8–11. In the next few paragraphs, the Court mostly quotes that summary, revised to refer to Anderson instead of Kemp.

To have preserved a claim for relief, Anderson must have properly exhausted his state remedies by fairly presenting that claim to the Arkansas courts and allowing them to rule on it. *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991); *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). "[A] claim has not been fairly presented to the state courts unless the same factual grounds and legal theories asserted in the prisoner's federal habeas petition have been properly raised in the prisoner's state court proceedings." *Krimmel v. Hopkins*, 56 F.3d 873, 876 (8th Cir. 1995). Anderson can lose a claim to procedural default at any level of state-court review: trial, direct appeal, or state post-conviction proceedings. *Kilmartin v. Kemna*, 253 F.3d 1087, 1088 (8th Cir. 2001).

Once a claim is defaulted, this federal Court can consider it only if Anderson can show either cause for the default and actual prejudice, or that the default will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. "[T]he cause standard requires [Anderson] to show that some objective factor external to the defense impeded counsel's efforts to raise the claim in state court." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (quotations omitted). Examples of cause include constitutionally ineffective assistance of counsel, an unavailable factual or legal basis for a claim, or interference by state officials that made complying with the exhaustion requirements impracticable. *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986). Anderson must also show "not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." 477 U.S. at 494 (quotations omitted and emphasis original).

An equitable exception exists to excuse the procedural default of ineffectiveness-of-trial-counsel claims — if the claim is substantial and post-conviction counsel was ineffective in not raising it. *Martinez v. Ryan*, 566 U.S. 1, 14 (2012); *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013). A substantial

ineffectiveness claim is one that has "some merit." *Martinez*, 566 U.S. at 14. Anderson must show deficient performance and resulting prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984). The Court assumes Anderson has made a sufficient showing that post-conviction counsel was ineffective in not raising his ineffectiveness-of-trial-counsel claims.

For his claims that the Arkansas courts decided on the merits, Anderson can obtain federal *habeas* relief only in two limited circumstances. This Court can grant relief only if the state's adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A decision is contrary to clearly established federal law if the rule the state court applied directly contradicted Supreme Court precedent or if, when faced with "materially indistinguishable" facts, the state court reached a decision opposite the Supreme Court's. *Kinder v. Bowersox*, 272 F.3d 532, 537–38 (8th Cir. 2001). "As for an unreasonable application of the law, we

-5-

must remember that unreasonable is not the same as incorrect." 272 F.3d at 538 (quotations omitted). Although a state court's application of federal law might be mistaken in this Court's independent judgment, that does not mean that it is objectively unreasonable. *Ibid.* Finally, the state court's factual findings are presumed correct unless Anderson "can rebut the presumption by clear and convincing evidence." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

3.      Anderson's petition is a vast fabric. It has twenty-one claims, which embrace seventy-eight subclaims, some of which have subparts. See Appendix A. The claims and supporting points, moreover, are a weave of incorporated contentions. Anderson's comprehensive argument is the product of appointed counsel's zealous, and able, advocacy. (Counsel for respondent Kelley have been equally zealous and able.) As the Court noted in its previous Orders, № 31 & 79, Anderson's new allegations about mental illness, brain damage, childhood trauma, and the neurobiological limitations of young people are the strongest. Because Anderson didn't fully present these issues to the Arkansas courts, this federal court can reach them only if his former lawyers were constitutionally ineffective in their related work.

That's the door created by *Martinez* and *Trevino*.  His lawyers' work, and necessarily the merits of these new allegations, were the main subjects of the four-day evidentiary hearing.  More about all that in a moment.

The rest of Anderson's claims are important but secondary.  Their resolution is clear.  The Court has therefore analyzed and decided them in a series of appendices — organized by subject.  This is the best way to scrutinize the fabric.  Anderson's several arguments for not raising various non-hearing claims in state court aren't persuasive.  His procedural defaults aren't excused.  See Appendix B.  And even looking past his defaults to the merits, these claims fail.  Settled precedent stops several of them at the door.  For example, the death penalty is constitutional.  See Appendix C.  Anderson's various attacks on his audio-taped confession, and related ineffectiveness claims, fail: the Arkansas courts adequately addressed the merits there; and his lawyers weren't ineffective. See Appendix D.  None of Anderson's points about problems in *voir dire*, some of which are new, make any headway.  Potential jurors were questioned adequately; he hasn't demonstrated that any juror was biased.  See Appendix E.  Anderson's venue-related arguments fail too.  See Appendix F.  Anderson says that his lawyers fumbled the mental-

capacity evidence in hand, as distinguished from his new claims about their not pushing deeper and wider to get different capacity evidence. These supposedly fumbled claims also fail for various reasons. See Appendix G. His improper-evidence claims don't fare any better. See Appendix H. Anderson also makes a miscellany of claims that he didn't present to the Arkansas courts. They, too, fail on the merits. See Appendix I. Last, Anderson's argument that he is actually innocent of the death penalty is unconvincing. See Appendix J.

**4.** Now back to the claims on which the Court heard four days of evidence and argument. Anderson's ineffectiveness claims — related to new evidence of an underdeveloped, damaged brain — cannot overcome the overwhelming evidence that he's guilty of capital murder. Whether *Strickland* required his lawyers to do more at resentencing, and whether it would have made a difference, are harder questions. In this Court's judgment, though, Anderson hasn't demonstrated a substantial claim of ineffectiveness. His lawyers' resentencing work wasn't constitutionally inadequate. Where their decisions were imperfect or their efforts fell short, Anderson hasn't demonstrated a reasonable probability of a different result. The

*Martinez/Trevino* exception therefore doesn't allow the Court to consider the related ineffectiveness claims on the merits.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. The defense presented by Anderson's lawyers at resentencing was powerful and their strategy gained ground, though not victory. The jury unanimously found thirty mitigators, almost all related to Anderson being abused and neglected as a child. On two additional mitigators, at least one juror found that Anderson shot Creech under extreme emotional distress and under unusual pressures or influences. Notwithstanding the mitigating circumstances, the strength of the aggravating circumstance (Anderson's attempted-murder conviction) and the circumstances of Creech's murder support the death sentence. Anderson's lawyers' conduct didn't undermine the adversarial process; the resentencing trial produced a just result.

"Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. The Court must avoid the temptation, from more

than twelve years' distance, to conclude that particular choices were unreasonable. Instead, to be fair all around, the Court must eliminate the distorting effects of hindsight, reconstruct the circumstances, and evaluate counsel's work from their perspective at the time. Did Anderson's defense team make reasonable choices, looking at the case as a whole? Yes.

Their theme was "childhood matters." Evidentiary Hearing, Vol. I (Sealed) 20. The defense team hit that theme in opening statement, carried it through the proof, and closed the case with it. The theme was, and is, compelling.

In opening, defense counsel compared the jury's task to reading a book: "You don't start a book in the middle of the story, you start from the beginning, and I think that's where we should start with Justin." Resentencing Record 2584. His lawyers then presented evidence of Anderson's disruptive and traumatic childhood, and they offered expert testimony describing its effects. They also took the Creech murder head on, describing Anderson's actions as terrible and senseless. They tried to explain, but not excuse, what he'd done. And they asked for mercy: "[M]ercy is something Justin could have shown Ms. Creech and didn't. He chose not to.

All I'm asking is that you don't make the same choice Justin made."
Resentencing Record 2590.

Anderson's position now is that his trial lawyers should have uncovered and presented a different explanation for his decision to murder Creech: he was a young man, mentally undeveloped, his brain damaged by fetal-alcohol effects and traumatized by a childhood of abuse and neglect. Anderson offered new experts: Dr. Victoria Reynolds, a clinical psychologist; Dr. Dale Watson, a neuropsychologist; Dr. Richard Adler, a psychiatrist; and Dr. Natalie Novick Brown, a psychologist. They testified that, as a result of *in utero* exposure to alcohol, Anderson has organic brain damage causing a moderate level of brain dysfunction. The effects of fetal alcohol, according to these experts, impair Anderson's executive functioning and behavior control, especially in unfamiliar and stressful situations. Dr. Reynolds added that Anderson suffers from post-traumatic stress disorder caused by a childhood filled with abuse, neglect, and abandonment. Dr. Brown described the interaction among Anderson's undeveloped brain, his exposure to childhood trauma, and the partial fetal-alcohol syndrome diagnosis: at age 19, Anderson had an "immature, doubly-damaged brain" that prevented him from

controlling his behavior when faced with the "unexpected scream from Ms. Creech." Evidentiary Hearing, Vol. IV 783, 864.

Anderson, however, has not demonstrated that his lawyers were so deficient in investigating and presenting mitigation evidence that they were "not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Their duty was "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. Anderson argues they should have developed evidence that he was exposed to alcohol *in utero*, arranged for neuropsychological testing, and had him assessed for PTSD. But his lawyers' decisions were not outside the range of reasonable choices. None of the experts—from the first trial or the resentencing—concluded that Anderson's brain was damaged, or pressed for neuropsychological testing. Anderson's lawyers diligently explored his background and the possibility of any brain dysfunction. They didn't "fail[] to act while potentially powerful mitigating evidence stared them in the face or would have been apparent from documents any reasonable attorney would have obtained." *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009).

-12-

Anderson was represented by an organized defense team.  At the first trial, Latrece Gray was the lawyer responsible for the penalty phase.   At resentencing, she took a larger role.  She and attorney Lou Marczuk were the team's core.  Lawyers Steve Harper and later Robby Golden assisted.  Janice Vaughn, who handled Anderson's first direct appeal, was also involved.  There was a mitigation specialist:  Carol Holloway.   And there were two investigators:  James Williams from Little Rock and Peter Briggs in south Arkansas.  Pam Welling was the paralegal.  The team's membership varied between eight and nine people.

Anderson's resentencing team recognized from the git-go that the approach to mitigation the first time had failed.  The jury didn't find one mitigator in *Anderson I*.  The lawyers therefore started their resentencing preparations afresh.  During the fourteen months between *Anderson I* and the second trial, they worked hard at trying to save Anderson's life.  They held regular  meetings with written agendas and strategy discussions.  The team addressed the various mitigation evidence:  forensics, social history, and witnesses.  They decided together which experts to use; over several months, they discussed and weighed Anderson's capacity and mental health.  Gray

prepared a Revised Mitigation Table with defense witnesses, their anticipated testimony, and supporting exhibits. Petitioner's Exhibit 4. It's twenty-four pages long. This table shows the defense team's industry, as well as its thoroughness.

Testing before the first trial had shown Anderson wasn't intellectually disabled. The defense expert then—Dr. Andre Derdeyn—had found no organic brain disorder. For the second sentencing trial, the defense team decided to get another opinion. And the team wanted to retest Anderson's IQ. The lawyers went with two new experts: Dr. Rebecca Caperton and Dr. Elizabeth Speck-Kern, both psychologists.

Gray wrote each an engagement letter casting a wide net about potential deficits. She asked about a low IQ, a neuropsychological disorder, antisocial personality disorder, and the effect of childhood trauma. Gray enclosed many records: school records; the earlier psychological assessment, which diagnosed Anderson with a 65 IQ; the DHS records of physical and verbal abuse during Anderson's childhood, and his mother's boyfriend's conviction for that abuse; the forensic evaluation and first-trial testimony from the State Hospital psychological examiner; the first-trial mitigation testimony from Dr.

Derdeyn, family members, teachers, and DHS workers; and Dr. Derdeyn's report and notes. Petitioner's Exhibits 11 and 16. The team followed up on these letters with regular telephone conferences and email exchanges with both experts.

Arkansas Rule of Criminal Procedure 18.2, however, was Banquo's ghost at the defense team's regular meetings.

> Subject to constitutional limitations, the trial court may require that the prosecuting attorney be informed of and permitted to inspect and copy or photograph any reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments or comparisons.

The lawyers knew about this Rule. Gray told Dr. Speck-Kern that the team would wait until she made her findings before deciding about a report. Why? Because any report, Gray continued, had to be turned over to the prosecutor. Respondent's Exhibit 1, 26555. Gray testified that this Rule was why the team had decided against having psychologist Dr. James Moneypenny (who tested Anderson's IQ before the first trial) prepare a written report.

Before the first trial, the prosecutor had moved for the disclosure of any expert statements or reports, "including results of . . . mental examinations and of scientific tests . . .[.]" Trial Record 6. Although the Circuit Court never

filed an Order on that motion, at a hearing about a week before the first trial, the Court ordered the defense to immediately prepare a summary of any testifying expert's opinions and make the expert available to the prosecution for an interview. Trial Record 1510, 1526-29. The next day, relying on Rule 18.2, the Court ordered production of all records beneath any testifying expert's opinion, including notes and tests. Trial Record 1552-78. Before the resentencing trial, all the lawyers agreed that the Court's prior Orders and rulings stood unless modified; the Circuit Court so held. Resentencing Record 1174-76. Anderson's defense team thus knew that any neuropsychological test results were vulnerable to discovery.

The team also faced uncertainty. Would new tests help or hurt the defense? Anderson's lawyers faced the risk recognized in *Forrest v. Steele*, 764 F.3d 848 (8th Cir. 2014). Because the prosecutor "might have acquired any unfavorable results, . . . the consequences of negative results were potentially severe." 764 F.3d at 856. Any testing offered by the two new experts had to be weighed against the possibility that the uncertain results could be used against Anderson.

Dr. Caperton's specialty was mental functioning and IQ testing. She determined that the scoring on Anderson's most recent IQ test—91—was correct. She told the defense team that she didn't think Anderson would score low enough for the results to be helpful. Having reached the end of that path, the team stopped consulting with Dr. Caperton.

Dr. Speck-Kern specialized in neuropsychology. Anderson's team contacted her because she regularly evaluated people with suspected brain injuries, cognitive issues, and language disorders. The team wanted to know if Anderson had any of these problems. Early on, Dr. Speck-Kern told the team that Anderson needed neuropsychological testing. She suggested giving him the Wisconsin card-sorting test for executive functioning. But—after spending almost two hours with him—she revised her recommendation. Dr. Speck-Kern acknowledged that Anderson's IQ revealed some cognitive limitations, but she found his "problems seem to mostly be emotional . . .[.]" She said Anderson "doesn't appear to act as if he is suffering from major brain damage." Petitioner's Exhibit 19. According to Gray's notes, Dr. Speck-Kern told her that Anderson "just seems average" and "nothing indicates frontal lobe damage." Dr. Speck-Kern had softened her view. She now told Gray

that neuropsychological testing would be only to "rule out" any brain damage. Petitioner's Exhibit 20. And other indicators cut against the need for testing. As Dr. Speck-Kern would highlight in her testimony, Anderson, while in prison, had passed the GED, started reading novels and history, done some writing, and taken an anger management class.

The defense team worked to understand, evaluate, and act on Dr. Speck-Kern's conclusions. The exchange between Dr. Speck-Kern and Gray about the psychologist's meeting with Anderson shows the deep collaboration between the lawyers and this expert—and the shade of Rule 18.2. After meeting with Anderson, Dr. Speck-Kern called Gray to discuss her observations and findings. Gray made notes during their talk. Then she typed them up and emailed them to the defense team and Dr. Speck-Kern. Gray testified that she asked Dr. Speck-Kern to correct any misunderstandings. The expert did so. Correcting Gray's note that no tests were warranted, for example, Dr. Speck-Kern wrote: "I have tests for cognitive and emotional concerns, but that could introduce a lot more than you wish to have presented. Usually you [defense lawyers] do not want emotional tests, so I'm going by that too." Petitioner's Exhibit 19. But the

psychologist left Gray's summation of her expert opinion unaltered: "S.K. doesn't think Justin brain injured, just never parented." Petitioner's Exhibit 19.

As the testing issue came to a head, Anderson's lawyers were also weighing whether he should testify at resentencing. Their on-going prep work with him would have reasonably informed their decision about neuropsychological tests. And the strength of his eventual testimony dovetails with Dr. Speck-Kern's opinion.

Anderson didn't testify at his first trial. He wanted to do so at resentencing. He did, articulately and thoughtfully. His introspective letter to his father, Jerry, was introduced into evidence. Anderson told the jury that, while in prison, he had earned his GED and completed an anger resolution seminar. He expressed regret that he hadn't tried harder in school. The defense presented Anderson's school records, which showed he'd changed schools at least six times in twelve years. He failed the fourth grade; he repeated the eighth grade at least twice; and he didn't finish the ninth grade. Anderson explained that he sometimes did poorly to spite his father. Other times, he said, he felt like he wasn't smart enough. Anderson took

responsibility for killing Creech.  He was remorseful.  He apologized to the Creech family for "all the pain" that he'd caused them.  Resentencing Record 3750.  He kept his composure under vigorous cross-examination.  As one of his lawyers pointed out in closing, Anderson didn't respond in kind or lose his temper when the prosecutor yelled out some of his questions.

**Adolescent Brain.**  More scientific testimony about Anderson's undeveloped nineteen-year-old brain wasn't necessary.  The Circuit Court instructed the resentencing jurors to use their common sense.  Resentencing Record 3965.  That suffices — we've all been nineteen, been around 19-year-olds, and have experience with family or friends that age.  Young people make poor, impulsive choices without weighing potential consequences adequately.  And Anderson's lawyers presented a bit of evidence on this point.  Dr. Speck-Kern testified that the frontal lobe — the brain's executive center — is the last brain area to develop; she said that development continues until age twenty-five.  Once this brain area is fully matured, according to Dr. Speck-Kern, we are able to "think through things" and "evaluate our behaviors in a different way."  Resentencing Record 3864–65.  The resentencing jury was simply not convinced that Anderson's age qualified as

a mitigating circumstance.  Anderson's lawyers' work here was adequate; and more testimony on this point wouldn't have made a difference.

**Trauma Disorder.**   Anderson's lawyers missed the label—post-traumatic stress disorder—but they told the story.  They worked hard at presenting a full picture of Anderson's abusive and traumatic childhood.  They used expert testimony, moreover, to describe its long-term effects on him.

Anderson and his brother, Maurice, testified that they were first abused by their mother's boyfriend, Amos Strickland.  Anderson was then only four or five years old.  They both said their mother—who is intellectually disabled—didn't protect them.  Anderson's lawyers called to the stand daycare workers and DHS employees who were involved with Anderson's removal from his home—after he twice showed up at daycare with a swollen face.  A Texarkana police officer testified that, as a result of the abuse, Strickland pleaded guilty to injuring a child.  Anderson described his seven months with a foster family as the best time of his life.  He was nurtured for the first time.  Though he got to take the bicycle that his foster family had given him when he went to live with his father, Jerry, the nurturing ended.

Anderson and Maurice testified about Jerry's escalating abuse and daily drinking. They described living in a motel room, going hungry, stealing food, and being beaten on their bare skin with belts and extension cords wrapped in duct tape. Family members echoed the brothers' testimony about Jerry's neglect and drunkenness, though they claimed not to have known the extent of the abuse.

Dr. Speck-Kern explained this trauma's effect. She testified that Anderson's unstable and traumatic childhood affected his ability to cope. She described his feelings of isolation and his difficulty forming attachments. She told the jury that Anderson was afraid of "everything." Resentencing Record 3869. She said he had been withdrawn and chronically depressed for much of his life. She said that he approached problems with a "series of impulses." Resentencing Record 3864.

All this testimony was effective. The jury was convinced by the childhood-trauma evidence and unanimously found the many related mitigators. His lawyers' efforts related to Anderson's childhood trauma and its effects weren't constitutionally ineffective. And Anderson hasn't

demonstrated that adding the medical diagnosis—PTSD—would have affected the outcome, especially in light of the jury's mitigation findings.

**Neuropsychological Deficits.** Much of this Court's recent evidentiary hearing was about whether Anderson's lawyers should have pursued neuropsychological testing and a partial fetal alcohol syndrome diagnosis. Anderson argued that his lawyers latched onto his IQ to the exclusion of any other brain dysfunction. There were hints, particularly when viewed in hindsight, that testing was needed: Anderson's low IQ and poor academic performance, his substance abuse, his difficulty communicating, his impulsive behavior, his family history of intellectual disability, his disruptive and traumatic childhood, and the accounts of Ruby's drinking. And Dr. Speck-Kern initially suggested the Wisconsin card-sorting test, an easily administered protocol. But after reviewing Anderson's records and meeting with him twice, Dr. Speck-Kern didn't think he was brain-damaged. She down-graded her recommendation; testing would just be to rule out any brain injury. These circumstances brought home the prospect of creating evidence helpful to the prosecution. Based partly on Dr. Speck-Kern's final

conclusions, Anderson's defense team, it is clear to this Court, made the tactical choice not to have Anderson tested.

The lawyers reasonably relied on the informed judgment of Dr. Speck-Kern—a qualified expert with a sufficient basis for her opinion under Arkansas Rule of Evidence 702. It's true that the lawyers were driving; whether Anderson should be tested was their call. But when an informed, qualified expert makes a judgment, it is within the range of constitutionally permissible choices for the lawyer to accept the expert's opinion. The hindsight view is that there was no good reason not to have Anderson tested. An easy rule-out test seems like the most prudent step. But recall that Rule 18.2 was in the room, too. And his lawyers' choice was supported by Anderson's planned testimony. There's an obvious disconnect between Anderson, the brain-damaged young man, and the put-together person that he revealed on the stand at the resentencing trial. Evidence of Anderson's actual functioning in the years after the crime—his GED, his well-written letter to his father, his articulate testimony, and his remorse—pulls in the opposite direction of the recent neuropsychological test results.

-24-

In his closing argument to this Court, Anderson made a strong argument from *Antwine v. Delo,* 54 F.3d 1357 (8th Cir. 1995) on the more-testing point. There, the Court of Appeals concluded that the trial lawyer's decision not to seek a second mental examination was constitutionally unreasonable—"more like inadequate trial preparation than a strategic choice." 54 F.3d at 1367. The lawyer was aware of substantial evidence that the defendant's abnormal behavior on the day he killed two people was not due to PCP intoxication. That other evidence was at war with the court-appointed psychiatrist's conclusion that Antwine didn't suffer from any mental disease or defect. That psychiatrist's evaluation had consisted of interviewing Antwine for twenty minutes and reviewing the police background sheet. 54 F.3d at 1365. The circumstances here are different. Anderson's lawyers consulted with more than one expert. Dr. Speck-Kern's evaluation was thorough; she reviewed numerous records, met with Anderson, and communicated regularly with the defense team. When needed, she corrected their understanding of her work. And she revised her opinion about testing only after a long meeting with Anderson. The lawyers knew about her careful consideration and made the tactical choice—with Rule

18.2 in the background—to rely on her revised opinion. Both in terms of the available evidence, and the quality of the expert's work, this case is unlike *Antwine*.

Perhaps Anderson's lawyers should have uncovered the evidence that Ruby drank while she was pregnant, which would have led to a partial fetal alcohol syndrome diagnosis. They could have introduced Anderson's new brain images and recent poor neuropsychological test scores to show that his brain was damaged by the effects of fetal alcohol. But the defense team would have either been up against the person Anderson revealed at trial or lost the benefits of his testimony. And they would have had to get past the chilling facts of the senseless and unprovoked Creech murder. The jury agreed that childhood matters; it found thirty mitigators. But the jurors also unanimously agreed that Anderson didn't deserve their mercy. There's no reasonable probability that this new evidence would have changed any of their minds. At some point, all the science offered at the recent evidentiary hearing moves beyond explanation to excuse—one bridge too far.

Anderson's ineffectiveness claims—about mental illness, brain damage, childhood trauma, and young people's neurobiological limitations—are not

substantial.  *Martinez/Trevino* doesn't excuse the procedural default.  These parts of Claims II and III therefore fail.

* * *

Anderson's petition for *habeas corpus* relief, № 1, will be dismissed with prejudice.  Reasonable judges could disagree about this Court's conclusions on three issues.  28 U.S.C. § 2253(c)(2); *Tennard v. Dretke*, 542 U.S. 274, 282 (2004).  The Court therefore grants Anderson a certificate of appealability on those issues:

- Was Anderson's lawyers' work constitutionally defective in not investigating the neurobiological limitations of young people, or in not presenting more evidence about this point in mitigation?

- Was Anderson's lawyers' work constitutionally defective in not investigating post-traumatic stress disorder, or in not presenting a medical diagnosis in mitigation?

- Was Anderson's lawyers' work constitutionally defective in not further investigating his neuropsychological deficits or fetal-alcohol exposure, or in not presenting facts about these points in mitigation?

So Ordered.

D.P. Marshall Jr.
United States District Judge

28 March 2017

## Appendix A — Claims

I.      Anderson is ineligible for the death penalty

      A.      Aggravating circumstance did not outweigh mitigating circumstances beyond a reasonable doubt

      B.      Anderson is actually innocent of the death penalty

      C.      Categorical death-penalty ban should be extended to persons under age twenty

      D.      Categorical death-penalty ban should be extended to persons with a mental disorder or disability significantly impairing capacity

II.     Anderson was denied the effective assistance of counsel at the guilt phase

      A.      Failure to investigate and move to suppress Anderson's statements and fruits based on an illegal arrest

      B.      Failure to challenge the voluntariness of Anderson's statements with evidence of police brutality and diminished mental capacity

      C.      Failure to protect Anderson's right to a fair trial and impartial jury

            1.      Failure to support venue motion with additional evidence

            2.      Failure to adequately question potential jurors

            3.      Failure to object to Circuit Court's excusal of qualified potential jurors

            4.      Conducting *voir dire* in a race-based manner

A-1

D.   Failure to investigate and present evidence of Anderson's diminished capacity, or challenge inadmissible and prejudicial capacity evidence

    1.   Moving for State Hospital evaluation

    2.   Failure to challenge his *Miranda* waiver with diminished-capacity evidence

    3.   Failure to adequately litigate Anderson's incompetence to stand trial

    4.   Failure to present a diminished-capacity defense

    5.   Failure to object to testimony that Anderson was diagnosed with antisocial personality disorder

    6.   Failure to object to substance-abuse testimony

    7.   Failure to use diminished-capacity evidence to support argument that Anderson didn't act with premeditation and deliberation

E.   Failure to stipulate that Anderson was convicted of the attempted capital murder of Roger Solvey

F.   Failure to object to testimony that Anderson shot Clara Creech while she was kneeling

G.   Admission to the Circuit Court that Anderson acted with premeditation and deliberation

H.   Eliciting damaging testimony from Anderson's half-brother Marcus Eason

I.   Making damaging statements during closing argument

A-2

J.    Failure to object to testimony based on the Confrontation Clause and Arkansas hearsay rules

K.    Failure to discover and object to juror misconduct

L.    Failure to object to prosecutorial misconduct

M.    Failure to ensure proper jury instructions

N.    Failure to object to *voir dire* conducted while Anderson wasn't present

O.    Failure to raise all colorable federal grounds in objecting to other-crimes-and-wrongs evidence

P.    Failure to object at first opportunity to the examination of Jerry Digman

Q.    Failure to argue cumulative error

R.    Cumulative attorney error

III.   Anderson was denied the effective assistance of counsel at resentencing

A.    Failure to adequately investigate and present evidence of Anderson's social history

B.    Failure to consult a qualified trauma expert

C.    Failure to investigate and present the effects of fetal alcohol exposure

D.    Failure to investigate and present qualified expert's testimony on neurobiological limitations of youth

A-3

E.      Failure to investigate and present Anderson's organic brain damage

F.      Failure to present a theme of social and institutional failure to protect Anderson during childhood

G.      Failure to adequately present the intellectual-disability argument

H.      Failure to investigate and present evidence that Anderson's death sentence was imposed in a racially discriminatory manner

I.      Failure to provide effective assistance during *voir dire*

         1.      Failure to object to the excusal of Penny Garrison

         2.      Failure to strike Nancy Solley

         3.      Failure to request using reimbursed peremptory strike retroactively

         4.      Conducting *voir dire* in a race-based manner

J.      Failure to present live testimony of mitigation witnesses

K.      Advising Anderson to testify

L.      Opening the door to presentation of Anderson's juvenile delinquency record, and failing to move for its exclusion

M.      Failure to prepare mitigation witnesses

N.      Introducing the expert report draft that included prejudicial information

O.      Failure to object to prejudicial bench conference from the trial being read to the jury

P.   Making damaging statements describing the crime

Q.   Allowed verdict form with plural of aggravating circumstance when prosecution alleged a single circumstance

R.   Failure to argue that Anderson is ineligible for the death penalty

S.   Failure to object to testimony based on the Confrontation Clause and Arkansas hearsay rules

T.   Failure to discover and object to juror misconduct

U.   Failure to object to prosecutorial misconduct

V.   Failure to ensure proper jury instructions

W.   Failure to object to improper victim-impact testimony

X.   Failure to object to the jury's consideration of improper aggravating circumstances

Y.   Failure to object to *voir dire* conducted while Anderson wasn't present

Z.   Failure to raise all colorable federal grounds for relief when (1) the Circuit Court refused to allow testimony supporting the theory that Anderson only had one gun at the time of the shooting; and (2) the prosecution introduced excessive guilt-phase evidence

AA.   Failure to argue cumulative error

BB.   Cumulative attorney error

IV.   The Circuit Court violated Anderson's right to a fair trial and impartial jury at trial and resentencing

A.     Denied motion for change of venue at trial

B.     Violated "fair cross section" requirement at trial and resentencing

C.     Unreasonably restricted *voir dire* at trial and resentencing

D.     Refused to excuse biased jurors at trial and resentencing

E.     Improperly excused, or refused to excuse, jurors based on their death penalty views at trial and resentencing

F.     Improperly found that the prosecution's use of peremptory strikes wasn't motivated by discrimination

G.     Excused qualified jurors at trial and resentencing

V.     The Circuit Court violated Anderson's right to confrontation by admitting hearsay testimony at trial and resentencing

VI.     Anderson was denied the effective assistance of counsel during the post-trial period

    A.     Failure to discover and raise juror misconduct claims

    B.     Failure to raise ineffective-assistance claims

VII.     Anderson was denied the effective assistance of counsel on direct appeal

VIII.     Anderson was denied the effective assistance of counsel during post-conviction proceedings

IX.     Anderson's death sentence was imposed in a racially discriminatory manner

X.   Anderson's constitutional rights were violated due to juror misconduct at trial and resentencing

   A.   Tested the gun trigger to determine whether Anderson could have accidentally fired the weapon (resentencing)

   B.   Witnessed Anderson in shackles, surrounded by law enforcement, and being placed in a patrol car (trial)

   C.   Failed to answer questions about the death penalty honestly

   D.   Juror exposed to outside influences when threatened by Anderson's brother during a trial break; and same juror later voted to convict despite the belief that Anderson wasn't guilty (trial)

   E.   Believed they were required to impose the death penalty (resentencing)

   F.   Biased alternate jurors involved in jury deliberations (trial)

   G.   Failed to disclose relationship with prosecutor

XI.   Anderson was denied a fair trial by prosecutorial misconduct at trial and resentencing

   A.   Improper comments to news media

   B.   Failure to disclose relationship with jurors

   C.   Improper argument during *voir dire*

   D.   References to homicide as a "murder"

   E.   Use of leading and argumentative questions during direct examination of Jerry Digman

A-7

F.    Introduction of testimony that prosecutor knew or should have known was false

G.    Improper and inflammatory argument

XII.   The Circuit Court violated Anderson's constitutional rights at trial and resentencing by admitting excessive evidence of other crimes — Solvey shooting and Magee burglary

XIII.  The Circuit Court's rulings on jury instructions at trial and resentencing violated Anderson's constitutional rights

A.    Instructed jury that it could convict Anderson if his acts were "premeditated and/or deliberated"

B.    Limited consideration of mitigation evidence; instructed jury to only consider evidence supporting a mitigating circumstance that probably exists

C.    Refused to give the definition of mitigating circumstances

D.    Erroneously responded to jury question about verdict form 3(b)

E.    Instructed the jury that, even if Anderson was sentenced to life imprisonment, he could still be released if the Governor pardoned him or commuted his sentence

XIV.  The Circuit Court's failure to suppress Anderson's statements and their fruits violated his constitutional rights

XV.   The Circuit Court violated Anderson's constitutional rights at resentencing by admitting improper victim-impact testimony; and the prosecutor impermissibly referred to victim-impact evidence during closing argument

A-8

XVI.   Jury's consideration of improper aggravating circumstances violated Anderson's constitutional rights

XVII.   The Circuit Court violated Anderson's constitutional rights by conducting critical stages of jury selection  while Anderson wasn't present

XVIII.   The Circuit Court violated Anderson's right to present  a defense by refusing to allow lay opinion that Anderson was depressed;  or police testimony that there wasn't evidence of more than one gun at the shooting

XIX.   The Circuit Court violated Anderson's constitutional rights by allowing excessive guilt-phase evidence at resentencing

XX.   The death penalty violates the Eighth Amendment

XXI.   This Court should conduct a cumulative assessment of whether constitutional errors occurred and whether those errors were prejudicial

A-9

### APPENDIX B — PROCEDURAL DEFAULT?

Anderson argues that his not raising many of his claims in state court isn't an "independent and adequate state procedural ground" barring habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). He says, alternatively, that any procedural default is excused.

**Rule 37 Petition.**  Anderson didn't raise most of his post-conviction claims in his petition.   But he argues these claims aren't procedurally defaulted for three reasons:  (1) there's no firmly established and regularly followed rule requiring him to raise the issues in his first Rule 37 petition, *Beard v. Kindler*, 558 U.S. 53, 60 (2009);  (2) he didn't have a reasonable opportunity to litigate the claims because his appointed post-conviction counsel was ineffective;  and (3) Arkansas's post-conviction remedy is ineffective due to a systemic failure to appoint qualified post-conviction counsel.

Anderson's arguments lack merit. Arkansas's rule against successive Rule 37 petitions is an adequate and independent procedural bar.  The procedural default occurred when Anderson didn't raise the claims in the first petition. *Wallace v. Lockhart*, 12 F.3d 823, 825 (8th Cir. 1994).  "[T]here is no

evidence that the alleged systematic failure . . . affected the performance of [Anderson's] counsel." *Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012). And this Court's application of *Martinez* and *Trevino* adequately covers Anderson's remaining ineffectiveness arguments.

**Direct appeal.** Anderson acknowledges that he didn't raise some of his claims on direct appeal. But he says these claims aren't procedurally defaulted because there's no firmly established and regularly followed rule requiring him to do so. Claims are procedurally defaulted, though, when they aren't fairly presented to the state appellate court. *Williams v. Norris*, 576 F.3d 850, 865 (8th Cir. 2009). Anderson's arguments against applying *Williams*, № 13 at 10–11, aren't convincing.

**Excuses For Procedural Default.** Most of Anderson's claims are procedurally defaulted. These are Claims I, V, VI, VII, VIII, IX, X, XI, XIII, XV, XVI, XVII, XVIII, XIX, XX, and XXI. The same is true for parts of Claims II, III, IV, and XII. Anderson's conclusory allegation of procedural-bar prejudice is insufficient to excuse his default, and this Court's review of the record hasn't uncovered any errors that "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Murray*, 477

U.S. at 494 (emphasis original).  Anderson has articulated several specific cause arguments;  and the Court will address them here.  But cause doesn't exist to excuse Anderson's procedural default of most claims.

Anderson says it does on claims about the constitutionality of the death penalty — Claims I(C) & (D) and XX — because his legal arguments are novel. *Reed v. Ross*, 468 U.S. 1, 16 (1984).  But the arguments aren't so novel that the "tools . . . to construct" them weren't available when Anderson was in state court. *Frizzell v. Hopkins*, 87 F.3d 1019, 1021 (8th Cir. 1996).

Next, Anderson says his trial and appellate lawyers' ineffective assistance caused most of his procedural defaults.  But he presented few ineffectiveness claims to the state courts as independent claims.  *Edwards v. Carpenter*, 529 U.S. 446, 451–53 (2000).  And, as addressed in Appendix D (pages D-5 — D-6) and Appendix G (page G-4), the ineffectiveness claims made in the Rule 37 appeal don't rise to the level of a constitutional violation. *Ibid.*

Anderson argues cause exists to excuse the procedural default of Claims II, III, X, and XI because his trial attorneys abandoned him.  He says they neither investigated grounds for a new trial motion nor filed one.  But

Anderson's lawyers never stopped acting as his representatives. *Maples v. Thomas*, 565 U.S. 266, 281–82 (2012). They didn't "literally abandon" him. *Sasser v. Hobbs*, 735 F.3d 833, 850 n.11 (8th Cir. 2013).

Anderson also says his trial attorneys had a conflict of interest with raising any ineffectiveness claims in a post-trial motion. And he argues this conflict excuses his procedural default of ineffectiveness sub-claims in Claims II and III that could have been raised by motion after trial. It's true that Anderson's attorneys would have been challenging their own work. And "the absence of conflict-free counsel on direct appeal" can be cause for the default of ineffectiveness claims that could have been raised on direct appeal. *Burns v. Gammon*, 173 F.3d 1089, 1094 (8th Cir. 1999). In Arkansas, however, ineffectiveness claims are generally raised in a post-conviction petition under Rule 37 instead of on direct appeal. *Dodson v. State*, 326 Ark. 637, 641–42, 934 S.W.2d 198, 200 (1996). The Arkansas Rules of Criminal Procedure's tight post-trial deadlines make it virtually impossible for ineffectiveness claims to be developed adequately or pursued successfully in a new trial motion. *Clemons v. Kelley*, No. 5:12-cv-176-DPM, № 40 at 24-25. And Anderson—unlike the petitioner in *Burns*—had conflict-free post-conviction

counsel who filed a Rule 37 petition on his behalf. The Court of Appeals, moreover, has recognized that Arkansas doesn't "as a systematic matter" afford defendants "meaningful review" of an ineffectiveness claim on direct appeal. *Sasser*, 735 F.3d at 853.

Cause based on conflict of interest doesn't exist to excuse the procedural default of the ineffectiveness claims heard at the evidentiary hearing. These claims weren't reviewable based on the trial record; so they couldn't have been raised or developed in a post-trial motion. To the extent *Burns* is the controlling precedent, cause may exist to excuse the default of the remaining ineffectiveness claims. But Anderson hasn't shown prejudice. His conclusory allegation is insufficient. And this Court already determined that Anderson — as to his non-hearing ineffectiveness claims — hasn't demonstrated "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." № 31 *at 2*.

Anderson also argues cause exists to excuse the procedural default of the juror misconduct claim (Claim X) and prosecutorial misconduct sub-claims (Claims IV(F) and XI(B)). He says these claims are based on previously unavailable facts and prosecutorial interference. But he hasn't developed his

B-5

cause argument.  He offers only bare assertions for why he didn't discover

facts to support these claims:  jurors weren't candid during *voir dire*;  the

prosecutor didn't disclose his relationships with jurors and lied about his

discriminatory motives for striking jurors;  and trial attorneys didn't know

about juror misconduct and weren't allowed *ex parte* conversations with

jurors. He hasn't shown "that some objective factor external to the defense

impeded counsel's efforts to raise the claim in state court." *McCleskey*, 499

U.S. at 493 (quotations omitted).  He hasn't shown why jurors' statements

outside of *voir dire* should be credited over *voir dire* responses under oath.  His

assertion that the prosecutor wasn't forthcoming is conclusory.  He hasn't

said if, or how, his trial lawyers were prevented from interviewing jurors after

trial.  Anderson's vague and unsupported allegations do not demonstrate

cause.

Finally, Anderson says cause exists—to excuse the default of

ineffectiveness and juror misconduct claims—based on post-conviction

counsel's ineffectiveness.   Cause does exist to excuse the default of

ineffectiveness-of-trial-counsel claims—Claims II, III, and VI—if the claim is

substantial and post-conviction counsel was ineffective in not raising it.

B-6

*Martinez*, 566 U.S. at 14;  *Trevino*, 133 S. Ct. at 1921.  The Court previously held that *Martinez* and *Trevino* don't apply to Claim VI because Anderson was arguing ineffective assistance of post-conviction counsel.  *№ 31.*  After further review, the Court concludes that Claim VI is actually about trial counsel's ineffectiveness;  therefore, *Martinez* and *Trevino* do apply.

The *Martinez* and *Trevino* equitable exception doesn't apply to Anderson's claims of ineffective assistance of appellate counsel or juror misconduct. *№ 31 at 2–3.* As the law stands now, the exception doesn't extend beyond claims of ineffective assistance of trial counsel.  *Martinez*, 566 U.S. at 14;  *Dansby v. Hobbs*, 766 F.3d 809, 833–34 (8th Cir. 2014), *cert. denied*, 136 S. Ct. 297 (2015);  *but see Davila v. Davis*, 650 Fed. Appx. 860, 865 (5th Cir. 2016), *cert. granted (in part)*, 2017 WL 125677 (13 January 2017).

Early in the case, the Court concluded that *Martinez* and *Trevino* don't apply to Claim X—juror misconduct;  the Court found Anderson was challenging the work of his appellate counsel, not his trial lawyers. *№ 31 at 3.* After further study, the Court amends its reason for this conclusion. *Martinez* and *Trevino* don't apply because the claim challenges  jurors' actions.

Anderson hasn't demonstrated cause and prejudice to excuse the default of Claims I, V, VII, VIII, IX, X, XI, XIII, XV, XVI, XVII, XVIII, XIX, XX, and XXI, or the defaults of the discussed parts of Claims IV and XII. These claims fail. The Court will apply *Martinez* and *Trevino* to Claims II, III, and VI.

### APPENDIX C—SETTLED LAW?

Anderson makes several claims that can't get past precedent. These are Claims I(C) & (D), II(R), III(BB),  IV(B), VIII, XX, and XXI.  A related ineffectiveness claim—part of Claim III(R)—fails for the same reason.  The governing statute and precedent allow for denial on the merits—notwithstanding Anderson's failure to exhaust state remedies.  28 U.S.C. § 2254(b)(2); *Joubert v. Hopkins*, 75 F.3d 1232, 1244 (8th Cir. 1996).  The Court therefore considers and summarily rejects these claims.

First, Anderson argues categorical death-penalty bans should be extended, making him ineligible for the death sentence because of his age and impaired mental capacity.  The United States Supreme Court has held that imposing the death penalty on a person who was less than eighteen years old when he committed the crime violates the Eighth Amendment.  *Roper v. Simmons*, 543 U.S. 551, 575 (2005).  And the Eighth Amendment likewise bars a death sentence for a person who's intellectually disabled.  *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).  Anderson was nineteen when he killed Creech; and he's not intellectually disabled within the meaning of *Atkins*.  This lower Court can't extend this precedent to cover him.

C-1

Second, Anderson says he is entitled to habeas relief because he was denied effective assistance of counsel during post-conviction proceedings. But there is "no constitutional right to an attorney in state post-conviction proceedings," so Anderson can't claim ineffectiveness during that part of the case. *Coleman*, 501 U.S. at 752.

Third, he contends the death penalty is cruel and unusual punishment in violation of the Eighth Amendment. But the United States Supreme Court has held that capital punishment is constitutional. *Gregg v. Georgia*, 428 U.S. 153, 186–87 (1976).

Fourth, Anderson asks this Court to consider the combined prejudicial effect of all alleged constitutional errors. He also argues he was denied effective assistance of counsel based on his lawyers' cumulative error. But "cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own." *Scott v. Jones*, 915 F.2d 1188, 1191 (8th Cir. 1990).

Fifth, Anderson argues his constitutional rights were violated because African Americans and poor folks were systematically underrepresented in Miller and Lafayette County jury pools when he was tried and resentenced. He claims the percentage of African Americans in these pools was

substantially less than the percentages in the Lafayette and Miller County populations, which were 37% and 23% respectively.   He says that he is still investigating the method of systematic exclusion;   and he offers some tentative explanations.   The Sixth Amendment entitles Anderson to an "impartial jury drawn from a fair cross section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 536 (1975).   But Anderson hasn't shown that African Americans or the poor weren't  fairly and reasonably represented on juries due to systematic exclusion. *Berghuis v. Smith*, 559 U.S. 314, 327 (2010).   He has provided only African American census data; he hasn't provided figures on the racial makeup of juror pools in the judicial district or any statistical analyses showing underrepresentation. *United States v. Horton*, 756 F.3d 569, 578 (8th Cir. 2014).

All Anderson's ineffectiveness claims about settled-law issues also fail. His lawyers' work wasn't deficient for not raising meritless claims. *Thai v. Mapes*, 412 F.3d 970, 979 (8th Cir. 2005).

APPENDIX D — ANDERSON'S STATEMENTS AND RELATED INEFFECTIVENESS?

Anderson argues the Circuit Court unconstitutionally denied his motion to suppress his statements and their fruits.  He says his waiver of Fifth and Sixth Amendment rights—to remain silent and to an attorney—wasn't voluntary, knowing, and intelligent.  He also says his statements were coerced.  This is Claim XIV.

At the suppression hearing, Arkansas State Police officers testified about their questioning of Anderson:  On the day of the Creech shooting, officers found Anderson at 2:30 p.m.  They advised him of his rights; he agreed to go with them to the county jail.  While Anderson waited in the sheriff's private office, officers continued their investigation.  At 5:50 p.m., officers again advised Anderson of his rights;  he completed and signed a *Miranda* form. They questioned Anderson about the Creech shooting for the next six and a half hours, with several breaks.  Anderson didn't admit to shooting Creech. After midnight, officers took Anderson to see his brother, Maurice, who was being held in a different part of the jail.  When Anderson returned to the sheriff's office, he admitted killing Creech and agreed to give a statement. Anderson gave an audio-taped interview at 1:48 a.m.  He said he still

D-1

understood his rights; and he acknowledged that officers had talked to him about waiving those rights. He stated that he walked up and "shot the old lady in the back" with a .38 caliber handgun. Trial Record 1223–24. Anderson thereafter directed officers behind an old Masonic Lodge where he had hidden a .38 caliber handgun and other items. During a second audio-taped interview at 2:26 a.m., Anderson admitted having burglarized Jeannie Magee's house, approximately ten days before, and having stolen two pistols and ammunition, as well as having shot the truck driver, Roger Solvey, a few days later.

The Circuit Court denied the motion to suppress. The Court found: (1) Anderson made his statements voluntarily after proper *Miranda* warnings; (2) he knowingly and intelligently waived his rights; and (3) there was no coercion or intimidation. Trial Record 1374–75.

In *Anderson I*, the Arkansas Supreme Court held that, though Anderson wasn't under arrest when officers initially approached him, the officers nonetheless verbally advised him then of his rights. 357 Ark. at 196–97, 163 S.W.3d at 341. And the Court affirmed the Circuit Court's finding that Anderson's statements were voluntary. 357 Ark. at 195–96, 163 S.W.3d at

340–41.  Addressing Anderson's argument that officers subjected him to a thirteen-hour interrogation, the Court held interrogation length was "one factor to be considered" and was "not determinative" of voluntariness.  *Ibid.* The Court noted that "Anderson was nineteen, had previous experience in the criminal justice system, was *[M]irandized* on several occasions, and took breaks during the interrogation."  *Ibid.*  The Court didn't consider Anderson's 1996 IQ test because it wasn't introduced at the suppression hearing. 357 Ark. at 194–95, 163 S.W.3d at 340.

Whether Anderson's statements are valid "is a legal question requiring *de novo* review, although subsidiary factual determinations are entitled the 28 U.S.C. § 2254(d) presumption of correctness."  *Holman v. Kemna*, 212 F.3d 413, 420 (8th Cir. 2000).  Also, this Court may consider only the facts before the state court.  *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

The Arkansas Supreme Court's decision wasn't contrary to, or an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d)(1). Both Anderson's waiver and his statements were voluntary; the analysis is "essentially the same" for these related claims.  *United States v. Havlik*, 710 F.3d 818, 822 (8th Cir. 2013).  The interrogation circumstances

don't show Anderson's "will [was] overborne" or "his capacity for self-determination critically impaired." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). Anderson hasn't pointed to any "coercive police activity." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). And Anderson's waiver was knowing and intelligent; this record shows he understood his rights and the consequences of abandoning them. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

Anderson contends § 2254(d) doesn't apply to this Court's review of whether his waiver was voluntary, knowing, and intelligent. He says the Arkansas Supreme Court addressed only the voluntariness of his statements, not the validity of his waiver. This argument fails. Anderson hasn't rebutted the presumption that the Supreme Court adjudicated his waiver argument. *Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

Anderson also argues his lawyers should have bolstered his suppression argument with additional evidence about many things: an illegal arrest, police brutality, his mental health problems, his impaired neuropsychological functioning, and his intellectual disability. He says his lawyers should have introduced a 1996 report, which showed he has a mild

intellectual disability based on his full-scale IQ of 65.   These are Claims II(A),(B) & (D)(2).

The Arkansas Supreme Court, in *Anderson III*, rejected the only piece of these sub-claims that Anderson properly raised in state court—whether his lawyers were ineffective for not introducing intellectual-disability evidence. The Supreme Court referred to the State Hospital report that Anderson wasn't intellectually disabled.   And the Court noted that intelligence is one of many circumstances to be considered in determining a suppression issue.   The Court then held Anderson didn't show *Strickland* prejudice—based on his own resentencing testimony that he was guilty and his statements were voluntary. 2011 Ark. at 11–12, 385 S.W.3d at 791.

The Arkansas Supreme Court's decision wasn't contrary to, or an unreasonable application of, federal law. 28 U.S.C. § 2254(d)(1).  Anderson says the Supreme Court shouldn't have considered his resentencing testimony in its *Strickland* analysis because the testimony wasn't available at the suppression hearing.   But even if Anderson is correct on this point, the Supreme Court "reasonably could have concluded" that Anderson hadn't made a sufficient showing of prejudice. *Williams v. Roper*, 695 F.3d 825,

D-5

834–37 (8th Cir. 2012) (quotations omitted). There's no reasonable probability the statements would have been suppressed if Anderson's lawyers had introduced the 1996 report. *Strickland*, 466 U.S. at 694. The record is clear that Anderson understood his rights and wasn't coerced. And the 1996 report didn't definitively establish that Anderson is intellectually disabled. As noted by the Supreme Court, available expert reports conflicted about Anderson's intelligence level. *Anderson III*, 2011 Ark. at 10, 385 S.W.3d at 790.

The remaining ineffectiveness claims—about other evidence Anderson's lawyers should have raised to support his suppression argument—are procedurally defaulted. Applying *Martinez* and *Trevino*, the procedural default isn't excused. Anderson hasn't demonstrated a substantial ineffectiveness claim. His lawyers' work wasn't deficient. And even if the Court is wrong about deficiency, Anderson hasn't shown prejudice. *Strickland*, 466 U.S. at 687.

## APPENDIX E — *VOIR DIRE* PROBLEMS?

Anderson raises a host of imperfections in both trial and resentencing *voir dire*. These are Claims IV(C–G) and XVII. In Claims II(C)(2–4) & (N) and III(I) & (Y), and in Claims IV and VII, he says there are things his lawyers should have done differently.

**Exhausted And Related Claims.** Anderson fairly presented in state court three *voir dire* claims about his first trial: (1) the Circuit Court didn't allow adequate *voir dire,* (2) the Court excused qualified potential jurors who were willing, though hesitant, to impose the death penalty, and (3) the Court violated *Batson v. Kentucky*, 476 U.S. 79 (1986). For the first time, he also makes two related claims — about the prosecutor's discriminatory strikes and the Circuit Court's *voir dire* restrictions — from resentencing.

First, Anderson argues the Circuit Court's restrictions on *voir dire* made his trial fundamentally unfair. He says the Court didn't allow a supplemental jury questionnaire, restricted counsel's ability to ask questions and rehabilitate jurors, and generally thwarted his lawyers' efforts to question potential jurors. This is Claim IV(C).

E-1

The Arkansas Supreme Court rejected a part of this argument in *Anderson I.*   The Supreme Court held the Circuit Court didn't abuse its discretion in limiting individual *voir dire* on certain topics: favoring one child, knowing someone with an intellectual disability, experiencing domestic violence, and having a spouse employed in the circuit clerk's office. 357 Ark. at 203–04, 163 S.W.3d at 345–46.   The Supreme Court found these issues weren't "so plainly appropriate" for inquiry that the Circuit Court's rulings had to be reversed. *Ibid.*   And the Court noted the Circuit Court didn't allow these questions because Anderson's lawyers should have asked them during general *voir dire*. *Ibid.*

The Arkansas Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established law.   28 U.S.C. § 2254(d)(1). The Constitution didn't require the Circuit Court to allow any question that "might be helpful."   *Mu'Min v. Virginia*, 500 U.S. 415, 425–26 (1991). Anderson hasn't demonstrated that the Circuit Court's restrictions in these areas made his trial fundamentally unfair.   *Ibid.*   The other parts of this claim—from trial and resentencing—are procedurally defaulted. The default isn't excused.   And the arguments fail on the merits anyway.   28 U.S.C.

E-2

§ 2254(b)(2). Anderson's trial wasn't rendered fundamentally unfair by any of the Circuit Court's *voir dire* restrictions.

Second, Anderson's claims about the death-penalty views of three potential jurors — one seated and two excused — at his first trial were mooted by his resentencing. This part of Claim IV(E) & (G) fails.

Third, Anderson argues the prosecutor used peremptory strikes — on three African American women and one Caucasian woman — to reduce the number of African American and female jurors at his first trial. And he says the Circuit Court didn't properly apply *Batson's* familiar three-step framework. 476 U.S. at 96–98. Anderson makes another *Batson* argument about two resentencing jurors. His resentencing claim is procedurally defaulted; and Anderson hasn't demonstrated any excuse for the default. This is Claim IV(F).

The Arkansas Supreme Court rejected a similar argument — about the first trial jurors — in *Anderson I*. The Court held the prosecutor gave race-neutral reasons to support the peremptory strikes of the four prospective jurors: Charlene Grisham gave inconsistent responses to questions about her death penalty views; Mattie Pearl Cooper appeared familiar with the facts

and was friends with Anderson's grandmother, but claimed to know nothing about the case; Cooper's sons and Deidre Hamilton's husband had been prosecuted by a prosecution team member; Sherry Dudley was equivocal about her death penalty views; and overall, the Court discerned no discriminatory pattern against women in jury selection. 357 Ark. at 205–08, 163 S.W.3d at 347–49.

The Arkansas Supreme Court's decision was not based on an unreasonable determination of the facts in light of the state court evidence. 28 U.S.C. § 2254(d)(2). Anderson isn't entitled to relief based on new facts. *Cullen*, 563 U.S. at 182. This Court must presume the state court's factual findings are correct; Anderson has the burden of rebutting that presumption with clear and convincing evidence. *Davis v. Ayala*, 135 S. Ct. 2187, 2199–2200 (2015). He is entitled to relief only if "it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice v. Collins*, 546 U.S. 333, 338 (2006). Anderson hasn't cleared this high bar. "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016) (quotations omitted). But this case is nothing like *Foster*. There's no evidence

in this record demonstrating "a concerted effort" to exclude black prospective jurors. 136 S. Ct. at 1755.

Anderson says the prosecutor fished for a reason to exclude Grisham. But the questioning was in the main channel. He says the prosecutor mischaracterized the prospective jurors' responses. But the prosecutor gave a fair interpretation. He says the prosecutor's stated reason for striking Cooper and Hamilton—family members had been prosecuted—was inconsistent with the decision not to strike Juror Jimmy Stultz. But the struck jurors had had immediate family members—children and a former spouse—prosecuted; Stultz wasn't aware until *voir dire* that his uncle had been prosecuted. Trial Record 1947–49.

Anderson's argument that the Circuit Court misapplied the *Batson* framework presents a legal question subject to 28 U.S.C. § 2254(d)(1) review. *Edwards v. Roper*, 688 F.3d 449, 454 (8th Cir. 2012). Anderson says the Circuit Court found only that the prosecutor offered a race-neutral reason for the strike. He says the Court didn't take the next step and decide if the offered reason was, in fact, pretextual. The Court of Appeals rejected this argument in *Smulls v. Roper*. Though it is surely the better practice, "federal law has

never required explicit fact-findings following a *Batson* challenge, especially where a prima facie case is acknowledged and the prosecution presents specific nondiscriminatory reasons on the record." 535 F.3d 853, 860 (8th Cir. 2008). "A trial court's ruling on a *Batson* challenge is itself a factual determination, and [the Eighth Circuit has] repeatedly upheld rulings made without additional reasoning." *Ibid.* Anderson urges this Court to apply *Adkins v. Warden, Holman CF*, 710 F.3d 1241 (11th Cir. 2013). № 15. But Circuit precedent controls.

**Procedurally Defaulted Claims.** Anderson's remaining claims about the Circuit Court's alleged missteps during *voir dire* are procedurally defaulted. And he hasn't shown cause to overcome his default. In any event, Anderson's overarching argument—a violation of his rights to a fair trial and an impartial jury—either fails on the merits, or doesn't satisfy the requirements on the admission of new evidence, 28 U.S.C. § 2254(e)(2). His related ineffectiveness claims also fail. Anderson's lawyers weren't ineffective for not making these meritless arguments. *Thai*, 412 F.3d at 979.

Anderson complains the Circuit Court didn't excuse biased jurors. But Anderson's lawyers used peremptory strikes on most of them. *Ross v.*

E-6

*Oklahoma*, 487 U.S. 81, 85–86 (1988).  One of these—Juror James Bryant—was seated.  But Anderson hasn't shown that Bryant was biased.  Anderson says there's a constitutional violation arising from the Circuit Court's reconsideration of its refusal to strike Janice Nix for cause.  But the Circuit Court reimbursed Anderson's strike against her;  Anderson, moreover, had a strike to use in the interim.  Anderson also says the Court excluded qualified jurors at trial and resentencing.  But he hasn't shown that the seated jurors were biased. *United States v. Brooks*, 175 F.3d 605, 606 (8th Cir. 1999).  Finally, Anderson refers to some off-the-record *voir dire* when he wasn't there.  But his allegations aren't enough to show the right to a fair hearing was "thwarted by his absence." *United States v. Gagnon*, 470 U.S. 522, 526 (1985);  *see also Williams v. Kemna*, 311 F.3d 895, 898 (8th Cir. 2002).

Anderson also makes stand-alone claims that his lawyers' work during both trial and resentencing *voir dire* was constitutionally ineffective.  These claims are procedurally defaulted.  And *Martinez* and *Trevino* don't open the door for this Court to consider them.  None of these ineffectiveness claims is substantial.

E-7

Anderson says his attorneys didn't ask two jurors (John David Butler and Judy Gipson) and an alternate juror (William Ray Edwards) any questions about pretrial publicity exposure. And he says his lawyers should have asked follow-up questions of other jurors. Both Butler and Gipson lived outside Lewisville in Stamps. Pretrial publicity was covered during general *voir dire*. And the prosecutor asked about pretrial publicity during individual *voir dire* of Butler and Edwards. Both said they hadn't read or heard anything that would cloud their minds. Gipson said she had no specific knowledge of Anderson. Trial Record 2051–52, 2055, 2355, 2357, 2512. Anderson also says his lawyers should have asked about jurors' relationships with the prosecutor. But his claim is too vague and conclusory for this Court to review. Anderson hasn't demonstrated that counsel's jury-selection strategy was professionally unreasonable under *Strickland* standards. His lawyers were able to consider jurors' responses during both general *voir dire* and individual questioning by the prosecutor. His lawyers' questioning of jurors was adequate, not constitutionally deficient. And Anderson hasn't shown that the jury was tainted, or that a biased juror was seated. *Sanders v. Norris*, 529 F.3d 787, 790–94 (8th Cir. 2008). The Court also rejects Anderson's ineffectiveness claim

that a biased jury based on racially motivated peremptory strikes was empaneled. *United States v. Lee*, 715 F.3d 215, 222–23 (8th Cir. 2013).

Anderson next says his lawyers at resentencing should have tried to exclude jurors Nancy Solley or Angela Cutshall. But neither juror showed any bias during *voir dire*. Juror Cutshall said the appropriateness of the death penalty depended on the evidence and the severity of the crime. Resentencing Record 2285. Juror Solley initially said she didn't believe life without parole could be an appropriate punishment for a premeditated and deliberate killing. But, after some discussion of aggravators and mitigators, she said she would consider all the evidence and could return a verdict of life without parole. Resentencing Record 2069–70, 2074–76. Anderson hasn't demonstrated his lawyers failed him in not striking these jurors. *Williams v. Norris*, 612 F.3d 941, 954–55 (8th Cir. 2010).

### APPENDIX F — VENUE PROBLEM?

Anderson argues the Circuit Court made a constitutional mistake in denying his motion to move his first trial out of Lafayette County. He says that an impartial jury couldn't be seated based on the County's small population and the overwhelming negative publicity — inflammatory media coverage, gossip, and a pro-death penalty email that Creech's son-in-law (State Representative Russell Bennett) sent to friends and constituents. This is Claim IV(A).

The Arkansas Supreme Court rejected this argument in *Anderson I*. The Court recognized there's no error in denying a venue motion "if the transcript of the jury-selection process shows that an impartial jury was selected." 357 Ark. at 201–02, 163 S.W.3d at 344–45. Here, the lawyers asked about pretrial publicity during *voir dire*, and the Circuit Court concluded the jurors were impartial. *Ibid.* The Supreme Court noted that Anderson's lawyers agreed to all but one of the seated jurors — Juror James Bryant. And Anderson's lawyers didn't object to Bryant based on publicity exposure. *Ibid.*

Anderson says the Arkansas Supreme Court addressed only his state-law claim. He's correct that the Court cited only the state venue statute, ARK.

CODE ANN. § 16-88-201.   But he hasn't rebutted the presumption that the Court also adjudicated his federal claim on the merits. *Johnson*, 133 S. Ct. at 1096.   Anderson's observation that the Supreme Court didn't refer to the constitutional claim doesn't rebut the presumption. *Dansby*, 766 F.3d at 832. And Arkansas law isn't "less protective" than federal law on the issue of pretrial publicity. *Johnson*, 133 S. Ct. at 1096.   Both look to whether an impartial jury was seated. *Compare Bussard v. State*, 300 Ark. 174, 184, 778 S.W.2d 213, 217–18 (1989), *with Skilling v. United States*, 561 U.S. 358, 425–26 (Alito, J., concurring).   This claim is therefore reviewed under 28 U.S.C. § 2254(d).

The Arkansas Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law.   28 U.S.C. § 2254(d)(1).   In considering whether an impartial jury was seated, federal courts ask two questions: Was pretrial publicity so extreme that prejudice can be presumed? Based on a review of the record, did actual prejudice infect the jury? *Skilling*, 561 U.S. at 377.   This Court considers only the facts available to the state court. *Cullen*, 563 U.S. at 182.

Anderson says the Arkansas Supreme Court unreasonably applied federal law because the Court didn't analyze presumed prejudice. But he didn't raise a presumed-prejudice argument in his direct appeal brief. And this isn't one of those rare cases where pretrial publicity is so extreme that prejudice can be presumed. *Skilling*, 561 U.S. at 378–85. There wasn't a televised confession amounting to "kangaroo court proceedings." *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963). A "carnival atmosphere" didn't pervade the trial. *Sheppard v. Maxwell*, 384 U.S. 333, 358 (1966).

And the record doesn't show that pretrial publicity infected the jury with actual prejudice. *Skilling*, 561 U.S. at 385–95. Anderson says *Irvin v. Dowd*, 366 U.S. 717 (1961), required the Supreme Court's actual-prejudice analysis to look beyond panel members' *voir dire* responses. But the lawyers' questioning of potential jurors about potential bias was sufficient to "assess fitness for jury service." *Skilling*, 561 U.S. at 395. And this isn't a case like *Irvin.* The "sum total of *voir dire*" doesn't demonstrate a "pattern of deep and bitter prejudice [in] the community." 366 U.S. at 727. There, the publicity was much more extensive; newspapers reported the community's strong feelings

F-3

about the case. And the jurors here didn't show the bias and familiarity with the facts admitted by the *Irvin* jurors. 366 U.S. at 725–28.

In Claim II(C)(1), Anderson says his lawyers should have renewed the motion for a different venue and introduced more evidence of publicity-by-gossip and of media reports after the venue hearing. But he hasn't described the additional evidence, shown how his lawyers should have been aware of it, or explained how it would have made a difference. Anderson didn't fairly present this claim in state court. His procedural default isn't excused under *Martinez* and *Trevino* analysis because the claim isn't substantial.

## APPENDIX G — FUMBLED AVAILABLE MENTAL-CAPACITY EVIDENCE?

Anderson says his trial lawyers should have done more with the available mental-capacity evidence the first time around.  He faults them on several points:   not challenging State Hospital psychologist Dr. Charles Mallory's conclusions;   not better preparing defense expert Dr. Andre Derdeyn or consulting a different expert;  and not making better use of a 1996 report showing Anderson's full-scale IQ at 65 — in mild range of intellectual disability.  Anderson argues that, if his lawyers had done these things, then he wouldn't have been found guilty of capital murder.  He says the Circuit Court would have declared him incompetent to stand trial or found him ineligible for the death penalty.  He says, alternatively, that the jury would have come down differently:   either finding him not guilty by reason of mental disease or defect, or finding that he couldn't act with the premeditation and deliberation necessary to commit capital murder.[*]  These are parts of Claims II(D) and Claim III(G).

---

[*]Anderson also says his lawyers should have challenged the Circuit Court's instruction during the first penalty phase that unanimity was required to find Anderson had an intellectual disability.  Anderson's resentencing, though, moots this claim.

G-1

Anderson's lawyers tried to press the intellectual-disability issue. They moved for a competency evaluation and asked the Circuit Court to find Anderson ineligible for the death penalty. Anderson's 65 IQ score from the 1996 test could be low enough to create a rebuttable presumption of intellectual disability. ARK. CODE ANN. § 5-4-618(a)(2). But Dr. Mallory found that Anderson was competent. He concluded the 1996 test result wasn't reliable. Dr. Paul Deyoub, who administered that test, had questioned the IQ score at the time based on Anderson's other test results. Anderson's lawyers "didn't feel like there was enough to support retesting [Anderson] on his IQ issues." *Anderson III*, 2011 Ark. at 8, 385 S.W.3d at 789. The Circuit Court found Anderson was competent to stand trial and eligible for the death penalty.

Anderson argued on appeal that his death sentence should be overturned under *Atkins v. Virginia,* 536 U.S. 304 (2002). The Arkansas Supreme Court held that the issue was preserved because *Atkins,* which had been decided after Anderson's trial, "merely reaffirmed [Arkansas's] preexisting prohibition against executing the [intellectually disabled]." *Anderson I,* 357 Ark. at 216, 163 S.W.3d at 354–55. And the Court reviewed the

Circuit Court's decision under ARK. CODE ANN. § 5-4-618. *Ibid.* The Supreme Court held the 1996 IQ score didn't show that Anderson was intellectually disabled "at the time of committing capital murder," as required by the statute. 357 Ark. at 218, 163 S.W.3d at 356 (emphasis omitted). The Supreme Court concluded, in the alternative, that Dr. Mallory's report estimating Anderson's IQ score between 80–90 rebutted the presumption of intellectual disability. 357 Ark. at 218–19, 163 S.W.3d at 356.

Anderson now argues his lawyers should have asked for an evaluation somewhere other than Arkansas State Hospital. He says their work was deficient for not introducing the 1996 report at the competency hearing. And he challenges his lawyers' trial work. He says they should have pursued a lack-of-capacity defense. His lawyers called Dr. Derdeyn to testify that Anderson didn't have the mental state required for capital murder. Anderson argues his lawyers should have found a different expert. He argues, alternatively, they should have given Dr. Derdeyn more social history and questioned him about the link between Anderson's depression symptoms and mental capacity. Dr. Mallory testified that Anderson didn't have an intellectual disability or suffer from depression; he diagnosed him with

antisocial personality disorder, cannabis abuse, and alcohol abuse. Anderson says his lawyers should have introduced evidence of impaired adaptive functioning and challenged Dr. Mallory's report on various points: A history of drug and alcohol use rules out a major depression diagnosis; Anderson has an IQ score of 91 based on testing by a prison psychologist; Anderson's suicidal statements weren't credible; and the administered psychological tests accurately assessed competence.

In *Anderson III*, the Arkansas Supreme Court rejected the intellectual disability slice of this claim. The Court held that Anderson's lawyers made a strategic decision not to pursue further IQ testing. 2011 Ark. at 8, 385 S.W.3d at 789. This holding wasn't contrary to clear federal law or an unreasonable application of that law. 28 U.S.C. § 2254(d)(1). Anderson hasn't demonstrated that his lawyers' work was constitutionally ineffective on this point. One of those lawyers, Latrece Gray, testified at the state post-conviction hearing. She said the defense team didn't seek further IQ testing because they had the 65 IQ score, and there was the possibility that further testing would have produced a higher score. The Supreme Court didn't unreasonably rely on this testimony in assessing counsel's performance.

The remaining slices of this claim are procedurally defaulted; they weren't fairly presented in state court. *Krimmel,* 56 F.3d at 876. Anderson summarily alleged in his Rule 37 petition that his lawyers didn't properly investigate and present "mitigation evidence" and "mental health issues." № 9-10 at 6–7. At his post-conviction hearing and on appeal, Anderson's argument was that his lawyers should have done more to show that he has an intellectual disability. In *Anderson III*, the Arkansas Supreme Court rejected Anderson's "ineffective-assistance claims as to mitigation, mental retardation, and mental health . . .." 2011 Ark. at 10, 385 S.W.3d at 790. The focus of *Anderson III*, however, was on the intellectual-disability issue.

Anderson hasn't overcome the procedural default of this claim under a *Martinez* and *Trevino* analysis. And the claim fails on the merits anyway. Anderson wasn't prejudiced in the *Strickland* sense by any of these alleged errors. If his lawyers had presented the case now advanced by Anderson, the outcome would have been the same. Overwhelming evidence existed that Anderson had the mental capacity to be tried for, and found guilty of, capital murder; and overwhelming evidence existed that he was eligible for the death penalty.

G-5

## APPENDIX H—IMPROPER EVIDENCE?

Anderson says that, at trial, the Circuit Court admitted excessive evidence of other crimes—the Roger Solvey shooting and Jeannie Magee burglary. He says the Circuit Court made the same mistake at resentencing—plus compounded it by admitting guilt-phase and victim-impact evidence, and by erroneously responding to a jury question about weighing evidence. These are Claims XII, XIII(D), XV, XVI, and XIX. Woven into these claims, and in Claims II(O) and III(W), (X) & (Z)(2), Anderson says his lawyers should have worked harder to exclude all this evidence.

**Trial.** In a pretrial motion, Anderson asked the Circuit Court to prohibit during the guilt phase any mention that he stole guns and ammunition from the Magee house and that he shot Solvey. The Court denied Anderson's motion and his repeated objections to this testimony. The Court instead instructed the jury based on Arkansas Rule of Evidence 404(b): Other-crimes evidence isn't admissible to prove a defendant's character to show he "acted in conformity therewith"; but the evidence is admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Anderson now argues that admission of this evidence—his taped confession to the Solvey shooting, evidence of the Magee burglary, and details about the Solvey crime scene and Solvey's suffering—violated his due process rights. This is part of Claim XII.

In *Anderson I*, the Arkansas Supreme Court rejected Anderson's evidentiary argument under Ark. R. Evid. 404(b). 357 Ark. at 197–99, 163 S.W.3d at 341–43. The Supreme Court held the Magee burglary and Solvey shooting evidence was "necessary for the State to meet its burden of proving Anderson's premeditated and deliberate intent to kill Ms. Creech." 357 Ark. at 199–200, 163 S.W.3d at 343.

The decision wasn't contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d). This Court's review is "limited to determining whether [Anderson's] federal due-process rights were violated." *Osborne v. Purkett,* 411 F.3d 911, 917 (8th Cir. 2005). He must demonstrate that the asserted errors "were so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair." *Garcia v. Mathes,* 474 F.3d 1014, 1017 (8th Cir. 2007) (quotations omitted). The Circuit Court's admission of the other-crimes evidence wasn't "so

H-2

conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive [Anderson] of due process." *Osborne*, 411 F.3d at 917 (quotations omitted). The challenged evidence was extensive, but not egregious. Its admission didn't deny Anderson a fair trial. This part of Claim XII fails.

In a related ineffectiveness claim, Anderson says his lawyers' work was deficient for not federalizing the evidentiary argument. This claim is procedurally defaulted. Under a *Martinez* and *Trevino* analysis, the claim isn't substantial. Making the echoing constitutional argument in state court wouldn't have made any difference.

**Resentencing.** Anderson argues the Circuit Court's incorrect response to a jury question caused the jury to consider the Creech murder as an aggravating circumstance. This is Claim XIII(D). During deliberations, the jury returned to the courtroom and the foreman asked Circuit Judge Hudson if the jury should consider the "Roger Solvey circumstance, the Clara Creech circumstance, or both of them" as the aggravating circumstance to be weighed in verdict Form 3(b). *Anderson II*, 367 Ark. at 543–44, 242 S.W.3d at 235. By this point, the jury had already completed Form 1, 2, and 3(a); these forms required the jury to determine which aggravators and mitigators had been

proven.  Form 3(b) required the jury to determine whether the aggravators outweighed beyond a reasonable doubt the mitigators.  The Circuit Court instructed the jury to consider "all the evidence" and "give it whatever weight . . . appropriate in answering form 3(b), and following."  367 Ark. at 544–45, 242 S.W.3d at 235–36.  The Arkansas Supreme Court held that the Circuit Court's response didn't cause the jury to consider victim-impact evidence improperly as an aggravator.  *Ibid.*  When the jury asked the question, the Court explained, it had already decided the aggravators and mitigators, and was weighing them against each other.  *Ibid.*

The Arkansas Supreme Court's decision wasn't contrary to, or an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d)(1).  The Eighth Amendment doesn't bar consideration of victim-impact evidence when determining whether the death penalty should be imposed.  *Payne v. Tennessee*, 501 U.S. 808, 827 (1991).  And Anderson hasn't argued here that the Circuit Court caused the jury to improperly consider victim-impact evidence.  Instead, he now says the Circuit Court's response caused the jury to improperly weigh the Creech murder circumstances as an aggravator.  The fair-presentation requirement isn't met by "presenting a

H-4

claim that is merely similar to the federal habeas claim." *Nash v. Russell*, 807 F.3d 892, 898 (8th Cir. 2015) (quotations omitted).   Claim XIII(D) is procedurally defaulted.   And it fails on a merits review.   28 U.S.C. § 2254(b)(2).   Anderson hasn't shown that the mid-deliberations instruction so infected the trial that due process was violated. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).   The Supreme Court has held that the jury may, consistent with the Constitution, consider the circumstances of the crime when deciding whether to impose the death penalty. *Tuilaepa v. California*, 512 U.S. 967, 976 (1994).

Anderson also makes several related claims that the Circuit Court allowed improper evidence at resentencing:   victim-impact testimony from Creech family members beyond due process limits;   inadmissible victim-impact testimony from a prior offense (the Solvey shooting);   and excessive other-crimes and guilt-phase evidence.   He also says the prosecutor made unconstitutional references to the Creech family's death penalty views.   In a related claim, Anderson summarily lists "extralegal aggravating circumstances" considered by the jury.

H-5

Anderson challenged the victim-impact evidence in state court; he argued it must tend to prove or disprove aggravating and mitigating circumstances. The Arkansas Supreme Court held that the evidence was "admissible and relevant to the question of the punishment." *Anderson II*, 367 Ark. at 545, 242 S.W.3d at 236.

Relevant victim-impact evidence is "evidence about the victim and about the impact of the murder on the victim's family." *Payne*, 501 U.S. at 827. The Arkansas Supreme Court's decision wasn't contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). Anderson hasn't argued it was. His *habeas* claims about victim-impact evidence aren't the same as his state court arguments. These claims are therefore procedurally defaulted; they weren't fairly presented in state court. *O'Sullivan*, 526 U.S. at 848. Anderson hasn't demonstrated cause to excuse his default. And the claim would fail on the merits anyway. 28 U.S.C. § 2254(b)(2). Creech's relatives' testimony was not "so unduly prejudicial that it render[ed] the [resentencing] fundamentally unfair." *Payne*, 501 U.S. at 825. The prosecutor referred only to the family's cooperation and their victim-impact testimony; there was no reference to the family's death penalty views.

Resentencing Record 4001. The other-crimes and guilt-phase evidence was plentiful; but any error in admitting this evidence wasn't so prejudicial that Anderson's trial was rendered fundamentally unfair. *Garcia,* 474 F.3d at 1017. Anderson hasn't developed his related claim about the jury's consideration of "extralegal aggravating circumstances"; he only references his other claims. The Court has denied relief on these claims; Anderson's arguments fail here too.

Anderson also makes related ineffectiveness claims. He says his lawyers' work was constitutionally ineffective for not objecting to this evidence. These claims are procedurally defaulted. And the *Martinez* and *Trevino* equitable exception doesn't excuse the default. Anderson's lawyers' work was zealous on this point; their work wasn't constitutionally deficient. They moved to exclude much of this evidence before the resentencing trial and repeated their objections there when a legitimate argument was available. To the extent Anderson argues his attorneys should have raised these points in a post-trial motion or on appeal, this claim isn't substantial. He hasn't demonstrated that the Arkansas Supreme Court would have overturned his sentence on this basis.

H-7

## APPENDIX I—OTHER DEFAULTED CLAIMS?

Anderson's remaining non-hearing procedurally defaulted claims raise allegations of ineffective assistance, prosecutorial misconduct, juror misconduct, and trial error.  These are Claims I(A), V, VI, VII, IX, X, XI, XVIII, and much of Claims II, III, and XIII.  The Court has decided that all Anderson's arguments for excusing procedural default fail—with one exception:  The Court will consider whether *Martinez* and *Trevino* allow for a merits review of ineffectiveness-of-trial-counsel claims.  And the Court will address the merits of the remaining procedurally defaulted claims.  28 U.S.C. § 2254(b)(2); *Joubert*, 75 F.3d at 1244.

**Prosecutorial and Juror Misconduct, Trial Error, Death-Penalty Ineligibility, and Appellate Ineffectiveness.**   Anderson says that many errors were made at trial, on resentencing, and on appeal:

- the Circuit Court violated his constitutional rights by admitting hearsay testimony, refusing to admit favorable testimony, and improperly instructing the jury;

- there was prosecutorial misconduct, and the prosecutor's decision to seek the death penalty was based on racial discrimination;

- the aggravator didn't outweigh the mitigators;

- his appellate lawyer's work was ineffective;  and

I-1

- there was juror misconduct.

None of the Circuit Court's instructions violated due process. *Estelle*, 502 U.S. at 72. The Court didn't violate Anderson's right to confrontation. The admission of hearsay at sentencing doesn't violate confrontation rights. *United States v. Jackson*, 782 F.3d 1006, 1014 n.3 (8th Cir. 2015). Applying *Crawford v. Washington*, moreover, the challenged evidence and testimony from the 2005 resentencing was not "testimonial." 541 U.S. 36, 68–69 (2004). And even if some testimonial material came in, the error was harmless. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *Middleton v. Roper*, 455 F.3d 838, 857 (8th Cir. 2006). A pre-*Crawford* analysis applies to evidence and testimony from the 2002 trial. *Whorton v. Bockting*, 549 U.S. 406, 421 (2007). But any error there was harmless—based on the overwhelming evidence of Anderson's guilt. *Middleton*, 455 F.3d at 857.

The challenged evidentiary rulings and the prosecutor's statements weren't "so egregious that they fatally infected the proceedings and rendered [Anderson's] entire trial fundamentally unfair." *Garcia*, 474 F.3d at 1017 (quotations omitted); *see also Stringer v. Hedgepeth*, 280 F.3d 826, 829 (8th Cir. 2002). Anderson says the prosecutor's decision to seek the death penalty was

the result of racial discrimination—this case involved an African American defendant and a Caucasian victim. He relies on statistics to support his claim. But Anderson hasn't shown that "the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (emphasis original). In a *Batson* angle, Anderson also argues that the prosecutor's peremptory strikes show that racial prejudice motivated his decision to seek the death penalty. But the Court of Appeals rejected a similar argument in *Byrd v. Armontrout*, 880 F. 2d 1, 10 (8th Cir. 1989). There was a legitimate, race-neutral reason for seeking the death penalty; an aggravating circumstance existed—Anderson's conviction for the attempted murder of Solvey—to justify the capital murder charge. Finally, Anderson's various points about the prosecutor's relationships with jurors and his statements to the media are too vague and undeveloped for consideration.

Anderson also says the evidence didn't support the death sentence. He says no rational juror could have found that the single aggravator outweighed the "numerous and compelling" mitigating circumstances. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have" imposed a death

sentence. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted); *see also Skillicorn v. Luebbers*, 475 F.3d 965, 977-78 (8th Cir. 2007). One could have done so. This jury's decision to impose the death penalty is supported by sufficient evidence.

Anderson says his appellate lawyer's work was deficient for not raising various issues on appeal. The Court has rejected these same arguments as either stand-alone or ineffectiveness-of-trial-counsel claims. They fare no better here.

Based on the overwhelming evidence of guilt, Anderson hasn't shown the alleged juror misconduct at trial "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quotations omitted). The jury's brief and inadvertent exposure to Anderson in shackles, and to his getting into a patrol car, was harmless. And whatever first-trial jurors Emogene Ruple, Karen Soils, or John David Butler thought about the death penalty was mooted by resentencing.

Anderson says Juror Judy Gipson voted to convict him even though she didn't believe he was guilty. In a separate claim, Anderson says Juror Gipson had a brief encounter with his brother, Maurice—who, according to

Anderson's petition, jumped up, stomped his foot, and acted as if he was going to hit Gipson.  Anderson hasn't argued that Gipson's vote was linked to her alleged experience with Maurice.  He hasn't explained why Gipson didn't report the stomping episode to the Circuit Court.  Anderson hasn't proffered an affidavit from Gipson, or any other materials, supporting either his assertion that Gipson's vote was unmoored from her conclusion on guilt or that Maurice menaced her during the resentencing trial.  There's just nothing of record to support either Gipson claim.  As a general matter, this Court cannot consider evidence of a juror's thought processes; this evidence isn't admissible to impeach the verdict.  FED. R. EVID. 606(b);  ARK. R. EVID. 606(b).  The governing law prevents the "secret thought of one" juror from having "the power to disturb the expressed conclusions of twelve." *Mattox v. United States*, 146 U.S. 140, 148 (1892).  And the allegations here are unlike the race-infected comments that lifted the Rule 606(b) bar in *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017).  There's no suggestion that Gipson's vote was motivated by racial bias.

Nothing supports Anderson's allegations about alternate jurors entering the jury room and participating in deliberations.  The record is clear:  the

alternate jurors were sequestered while the jury deliberated; and they were escorted back to the courtroom after the jury reached a verdict. Trial Record 3607–11.   Finally, Anderson's allegation about jurors' not disclosing their relationships with the prosecutor — at both trial and resentencing — is vague and conclusory.

Anderson's arguments about juror misconduct at resentencing also fail on the merits.  He says some jurors voted for the death penalty only after they dry fired the murder weapon and determined the pistol's trigger wasn't light enough to be fired accidentally;  the trigger mechanism, he continues, wasn't in the same condition as on the day of the Creech murder.  But this wasn't an impermissible experiment;  the .38 revolver was in evidence.  *Compare Doan v. Brigano*, 237 F.3d 722, 733 (6th Cir. 2001), *abrogated on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003).   The jury's examination of the weapon was "merely part of the expected process of scrutinizing the evidence as part of its deliberations," not extraneous material. *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1341 (8th Cir. 1997).  Any potential prejudice was limited; all the jurors saw the "experiment" and could decide for themselves if the results

were consistent with other evidence.  And Anderson didn't mount a "the shot was accidental" defense.

Anderson's next argument—that jurors were confused by the verdict forms—also fails.  "[T]estimony or affidavits of jurors are incompetent to show that jury instructions were misinterpreted."  *Scogin v. Century Fitness, Inc.*, 780 F.2d 1316, 1320 (8th Cir. 1985).

Anderson also makes a bare allegation that Juror Angela Cutshall lied during *voir dire* and actually believed that any defendant guilty of purposeful murder should be sentenced to death.  He offered no affidavit from her.  He gave no context for her alleged about-face.  He hasn't said when it occurred.  Cutshall responded unequivocally during *voir dire:* her consideration of the death penalty depended on the "evidence and severity of the crime" and weighing aggravators and mitigators.   Resentencing Record 2283–95.  Anderson has given no reason to credit Cutshall's supposed more recent statement over her *voir dire* responses under oath.

Opinions can change with time, exposure to the public, and life experiences—particularly after serving as a juror in a capital murder trial and voting to impose the death penalty.  This Court must assume, moreover, that

I-7

Cutshall followed the Circuit Court's death-penalty instructions. *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985). Anderson isn't entitled to relief based on this record. And he hasn't provided any materials to support expanding the record. His assertion that Juror Cutshall lied is just too thin in a legal landscape that jealously protects jury deliberations. *Mattox*, 146 U.S. at 148.

With each of these claims, Anderson makes a related argument about his lawyers' work. He says they should have made objections and arguments, introduced evidence, and conducted investigations to support the claims. All these ineffectiveness claims are procedurally defaulted. *Martinez* and *Trevino* don't help. The claims aren't substantial; and Anderson's lawyers' work wasn't deficient for not raising meritless claims. *Thai*, 412 F.3d at 979.

**Other Ineffectiveness Claims.** Anderson makes a number of other procedurally defaulted ineffectiveness claims about his lawyers' work at trial and on resentencing. He argues there are stipulations, arguments, and objections that his lawyers missed both at his first trial and at resentencing; he says there are statements they erred in making and questions they should have asked. He alleges additional resentencing errors: his lawyers should have offered more, or better, evidence and withheld other evidence; done a

I-8

better job with witnesses; and not advised Anderson to testify. Anderson says that, at both trial and resentencing, his lawyers should have argued that the cumulative effect of trial errors entitled him to relief. *Martinez* and *Trevino* apply.

The threshold issue for these remaining ineffectiveness claims is prejudice. And Anderson hasn't met the *Strickland* standard. № 31 at 2. No reasonable probability exists that, absent these alleged errors, the outcome on guilt or resentencing would have been different. *Strickland*, 466 U.S. at 694. Even if all this evidence had been presented, or excluded, and all the new arguments made, as Anderson now contends, the juries' findings of guilt and on resentencing would have been the same. Because none of these non-hearing ineffectiveness claims are substantial, *Martinez* and *Trevino* don't allow for this Court's merits review.

In Claim VI(B), Anderson says his lawyers were ineffective because they didn't investigate and file a new trial motion raising ineffectiveness of trial counsel. But Anderson hasn't shown how trial counsel's performance was deficient. And the Arkansas Rules of Criminal Procedure's post-trial deadlines impede development of these claims in a new trial motion. *Clemons*

I-9

*v. Kelley*, No. 5:12-cv-00176-DPM, № 40 at 24–25.  The claim isn't substantial;

so Anderson's default isn't excused under a *Martinez* and *Trevino* analysis.

## APPENDIX J — ACTUAL INNOCENCE?

Anderson argues that he's actually innocent of the death penalty based on the hearing evidence. This is Claim I(B). Actual innocence can be a gateway for Anderson's defaulted claims in certain circumstances. He must establish, based on new and reliable evidence, that "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). Similarly, Anderson can challenge his penalty if he shows, with clear and convincing evidence, that "but for a constitutional error, no reasonable juror would have found [him] eligible for the death penalty under the applicable state law." *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992). The Supreme Court hasn't decided whether a freestanding claim of actual innocence "would render unconstitutional a conviction and sentence that is otherwise free of constitutional error." *Dansby*, 766 F.3d at 816. This Court need not reach that issue. Anderson hasn't shown that, even with the hearing evidence, no reasonable juror would have voted to find him guilty of capital murder. And he hasn't shown that no reasonable juror would have found him eligible for the death penalty. Anderson's actual innocence argument therefore fails both as a freestanding claim and a

J-1

gateway claim.  His related ineffectiveness claim also fails. *Thai*, 412 F.3d at 979.